## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

JAKZIRI MALDONADO SANTANA

CRIMINAL CASE NO.

1:17-cr-00408-AT-RGV

## MAGISTRATE JUDGE'S REPORT, RECOMMENDATION, AND ORDER

Defendant Jakziri Maldonado Santana ("Santana") is charged in a one-count indictment with knowingly and intentionally possessing and attempting to possess with intent to distribute at least 500 grams of a mixture and substance containing a detectable amount of methamphetamine in violation of 21 U.S.C. §§ 841(a) and (b)(1)(A) and 846.  [Doc. 10].[1]  Santana has filed motions to suppress evidence obtained following a traffic stop that occurred on October 27, 2017, and to suppress statements she made following her arrest on that day.  [Docs. 20 & 21].  After an evidentiary hearing was held on March 27, 2018, see [Doc. 33],[2] the parties filed post-

---

[1] The listed document and page numbers in citations to the record refer to the document and page numbers shown on the Adobe file reader linked to the Court's electronic filing database, CM/ECF.

[2] See [Doc. 35] for the transcript of the evidentiary hearing.  Citations to the evidentiary hearing transcript hereinafter will be referred to as "(Tr. at ___)."  In addition, the government submitted exhibits during the hearing, which will be referred to as "(Gov. Ex. __)," and Santana also submitted exhibits at the hearing,

hearing briefs on the pending motions, see [Docs. 45, 48, & 55].  For the reasons that follow, it is **RECOMMENDED** that Santana's motions to suppress, [Docs. 20 & 21], be **DENIED**.

## I.  STATEMENT OF FACTS

After learning that Drug Enforcement Administration ("DEA") agents in Texas had confiscated approximately eleven kilograms of methamphetamine that were intended for distribution in the Atlanta area, DEA Special Agent Sherezad Dunn ("Agent Dunn") traveled to Texas in October of 2017 to take custody of six kilograms of methamphetamine in order to complete a controlled delivery in Atlanta.  (Tr. at 4-6, 20-21).  The controlled delivery was to be arranged through a confidential source ("CS").  (Tr. at 8).  Prior to the controlled delivery taking place, Agent Dunn removed five of the six kilograms of methamphetamine, leaving one kilogram of methamphetamine, and she then placed "ten kilograms of . . . sham" packages "that look[ed] like the actual packaging of the meth[amphetamine]" and placed the eleven bundles, each of which was packaged separately in black electrical tape, in a black duffel bag.  (Tr. at 7-8).

On October 26, 2017, a deal with one buyer "did not go[] through," so the CS then arranged a transaction with a second buyer for the following day.  (Tr. at 8-10).

───────────────

which will be referred to as ("Def. Ex. __")."

2

The CS was given a phone number for the person who would pick up the drugs, (Tr. at 8-10, 21, 24, 29 (internal marks omitted)), and the CS spoke to the person, a female, by phone, and she agreed to meet in the parking lot of an L.A. Fitness in Duluth, Georgia, to pick up eleven kilograms of methamphetamine, (Tr. at 10, 25-27). On both the morning of October 26th, before the scheduled transaction that fell through, and the morning of October 27th, DEA agents and Georgia State Patrol ("GSP") troopers met near the agreed-upon location of the transaction to discuss the plan for the controlled delivery. (Tr. at 7-9, 22, 29). During the meeting on the morning of October 27, 2017, the agents and at least two troopers, including Trooper Ian Moremen ("Trooper Moremen"), discussed the intended plan for the controlled delivery, what kind and amount of drugs were involved, and how those drugs were packaged. (Tr. at 7-10, 23, 29, 50-53). In fact, Trooper Moremen was "able to see the actual narcotics" in the black duffle bag at the meeting on October 27, 2017, so he "knew the description of the items that were being transferred[.]" (Tr. at 53). Agents subsequently placed "the bag that had the one kilogram of meth and the ten kilograms of sham inside the CS's vehicle" in preparation for the controlled delivery. (Tr. at 10).

The CS drove to the L.A. Fitness parking lot in a metallic-colored Volkswagon vehicle, (Tr. at 32), and Agent Dunn also parked in the L.A. Fitness parking lot to

surveil the meeting. (Tr. at 11). Trooper Moremen moved to a spot within "a mile or two" of the L.A. Fitness and awaited further information. (Tr. at 52). An airplane was used to provide aerial surveillance of the scene. (Tr. at 12, 30).[3] Approximately one hour later, at 1:05 p.m., a black Mazda CX-7 sport utility vehicle with Georgia license plate RGX8971 pulled into the parking lot and parked beside the CS's vehicle. (Tr. at 10-11, 27, 33); see also (Gov. Ex. 1 at 00:26-00:40).[4] The driver of the black Mazda exited her vehicle, and after talking to the CS outside the two vehicles, she entered the CS's vehicle. (Tr. at 11, 34-35; Gov. Ex 1 at 00:53-1:09). They both exited the CS's vehicle, and the CS removed the black duffel bag containing the methamphetamine from the CS's vehicle and placed it in the back seat of the black Mazda. (Tr. at 11, 35-36; Gov. Ex. 1 at 3:25-4:46). The driver of the black Mazda then returned to her vehicle and left the scene, being followed by the agents at the scene and by the airplane. (Tr. at 11-13, 17; Gov. Ex. 1 at 4:48-5:20). At that point, Trooper Moremen, who had been in constant contact with the agents, was informed that the

---

[3] Agent Dunn testified that a National Guard airplane with a DEA task force officer aboard as "the spotter" was used for the aerial surveillance. (Tr. at 12).

[4] A video recording from the aerial surveillance was made of the movements of the black Mazda on October 27, 2017, from the time it entered the L.A. Fitness parking lot until it was subsequently stopped by Trooper Moremen. See (Gov. Ex. 1; Def. Ex. 1). Both the government and defendant submitted an exhibit of the video recorded aerial surveillance, see (Gov. Ex. 1; Def. Ex. 1); the Court will cite to the government's exhibit.

exchange had taken place, and he was provided the vehicle's description, tag number, and location. (Tr. at 11-13, 16, 52-53). DEA agents instructed Trooper Moremen to follow the subject vehicle until he could establish independent probable cause for a traffic stop. (Tr. at 16, 43, 55).

After the delivery was complete and the black Mazda had left the scene, the CS called the driver in the presence of Agent Dunn and another DEA agent, who was spoke Spanish. (Tr. at 14-15). The CS and the driver of the black Mazda discussed in Spanish the possibility of a later purchase of drugs at a cheaper price. (Tr. at 15). They referred to the drugs using the word "ventana," which Agent Dunn testified was a reference to "crystal ice, methamphetamine in ice form." (Id.). Agent Dunn then departed the area to take the CS to a secure location and turned the pursuit of the black Mazda over to the troopers. (Tr. at 16-17).

After leaving the L.A. Fitness parking lot, the black Mazda entered Interstate 85 South and began driving toward Atlanta. (Tr. at 82). Trooper Moremen, having been notified that the controlled delivery had occurred and that a female had picked up the drugs, began following the black Mazda, (Tr. at 52-53), and he witnessed at least three instances of the black Mazda crossing over the lines of its lane while the two vehicles were traveling south on Interstate 85, (Tr. at 38, 40-41, 58-59, 82-83). Trooper Moremen positioned his patrol vehicle where he could view the driver's

5

side window and was unable to determine whether the driver of the vehicle was wearing a seat belt due to dark window tint. (Tr. at 58, 83); see also (Gov. Ex. 1 at 22:10-22:45).[5] He then navigated his patrol vehicle to travel behind the black Mazda, and shortly after, activated the lights on his vehicle and initiated a traffic stop. (Tr. at 59; Gov. Ex 1 at 22:47). Trooper Moremen stated over the radio that he was stopping the vehicle for weaving within its lane and because the vehicle appeared to have dark window tint, as he was not able to see if the driver was wearing a seat belt. (Gov. Ex. 2 at 13:26:23-13:26:35). The driver of the black Mazda made two lane changes and pulled the vehicle to the shoulder of Interstate 85. (Tr. at 59; Gov. Ex. 1 at 23:20-23:38; Gov. Ex. 2 at 13:26:23-13:26:46). The vehicle and license plate matched the information provided by DEA agents, (Tr. at 12-13, 62), and the driver of the vehicle was later identified as Santana, (Tr. at 63-64).

As Trooper Moremen approached the passenger side of the vehicle, he was able to see that Santana was removing her seat belt. (Tr. at 60, 62, 87). He stood at the passenger side window and spoke to Santana, who informed Trooper Moremen that she did not have her driver's license with her, but had a photograph of it on her cell phone. (Tr. at 62-63; Gov. Ex. 2 at 13:27:03-13:27:20). Because he needed to view

---

[5] Trooper Moremen testified that "typically there[ was] a gap between the shoulder and the b-pillar where you can see the seat belt angling just to verify that they do or don't have it on[.]" (Tr. at 58).

the photograph of her license on her cell phone and was having trouble hearing her over the passing traffic, Trooper Moremen asked Santana to step to the rear of her vehicle.  (Tr. at 62-63; Gov. Ex. 2 at 13:27:22-13:27:26).  Santana exited the vehicle, and while she was pulling up the photograph of her license on her cell phone, Trooper Moremen asked where she was headed that day, and she then handed him her cell phone to view her license.  (Gov. Ex. 2 at 13:27:30-13:27:55).  Trooper Moremen told Santana that he had stopped her because he could not see whether she was wearing a seat belt due to her window tint and because she was weaving "all over [her] lane."  (Gov. Ex. 2 at 13:28:05-13:28:22).  He also told her that when he reached the window of her vehicle, he saw her remove her seat belt and that it was "no problem." (Gov. Ex. 2 at 13:28:12-13:28:15).[6]  Trooper Moremen proceeded to ask Santana a series of questions, including what she had been doing that day and where she was going.  (Gov. Ex. 2 at 13:28:24-13:31:00).  Trooper Moremen testified that he found Santana's answers to these questions suspicious.  (Tr. at 64-65); see also (Gov. Ex. 2 at 13:32:37-13:33:05).

During the roadside discussion, Santana admitted to Trooper Moremen that her driver's license was suspended and informed him that the vehicle belonged to

---

[6] Trooper Moremen informed a backup officer, who responded to the traffic stop, that he had stopped Santana for window tint and failure to maintain lane. (Gov. Ex. 2 at 13:32:32-13:32:37).

her sister, Jacqueline Maldonado, but that she was driving it with her sister's permission.   (Gov. Ex. 2 at 13:31:06-13:31:41).   Although Trooper Moremen repeatedly instructed Santana not to use her cell phone and even explained that he had safety concerns about "people pull[ing] up behind" him, Santana continued to use her cell phone until he removed it from her hand and placed it on the hood of his patrol vehicle.  (Tr. at 65-66; Gov. Ex. 2 at 13:28:52-13:29:20, 13:31:48-13:32:15). Trooper Moremen observed that Santana was jittery and nervous.  (Gov. Ex. 2 at 13:32:53).

After confirming through the Georgia Crime Information Center database that Santana's driver's license was suspended, Trooper Moremen placed Santana under arrest for driving on a suspended license and informed her that he was going to do an inventory search of her vehicle in order to protect her valuables prior to towing it.  (Tr. at 67-68, 72; Gov. Ex. 1 at 13:36:45-13:37:20).[7]  Trooper Moremen handcuffed

---

[7] Trooper Moremen did not inform Santana that she could have someone come and retrieve the vehicle.  See generally (Gov. Ex. 2).  He testified that it was "all a case-by-case scenario," and that "in this particular situation[, they were] at the base of an off[ ]ramp on the interstate," not in a confined parking lot or similar area, such that the "possibility for further accidents while someone [was] driving down the road looking on the shoulder for somebody . . ., along with the fact that [Santana was] from the south side of the city meaning it[ was] going to take typically a while for someone to respond."  (Tr. at 70-71, 103).  He further testified that he was "not going to stand there for 30 minutes on the side of the road and allow somebody to possibly come up and strike [him] from behind waiting on somebody" to retrieve the vehicle.  (Tr. at 71).

Santana at that time, and Santana asked if she could call her mother and let her know. (Gov. Ex. 2 at 13:37:27-13:37:35). Trooper Moremen responded that he would let her mother know in a minute. (Gov. Ex. 2 at 13:37:29).

Trooper Moremen then proceeded to do an inventory search of the vehicle. First, he removed Santana's purse from the vehicle, and he verbally noted the smell of marijuana and asked Santana when she last smoked. (Gov. Ex. 2 at 13:38:40-13:38:51; Tr. at 73-74). He also asked Santana whether there was marijuana in the vehicle. (Gov. Ex. 2 at 13:39:05; Tr. at 74). When he opened the back door of the vehicle, Trooper Moremen saw a black duffle bag on the rear seat, which he "had been show[n] earlier" at the briefing. (Tr. at 73). He asked Santana who the bag belonged to and if there was anything of value in it, and she responded that it belonged to a friend, that it was not hers, and that she knew nothing about the bag or its contents. (Gov. Ex. 2 at 13:39:34-13:40:26; Tr. at 75). Trooper Moremen then removed the bag from the vehicle and placed it on the hood of his patrol vehicle. (Gov. Ex. 2 at 13:41:02). Trooper Moremen next read Santana her <u>Miranda</u>[8] warnings, and she nodded her head when asked if she understood and if she wished to speak with him. (Gov. Ex. 2 at 13:41:10-13:41:45; Tr. at 75). After opening the bag, he told Santana that the contents of the bag appeared to him to be a large amount

---

[8] <u>See</u> <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

of narcotics.  (Gov. Ex. 2 at 13:41:48).  Trooper Moremen informed her that she was now under arrest for "more than driving without a license."  (Gov. Ex. 2 at 13:42:00). Santana again stated that she did not know what was in the bag.  (Gov. Ex. 2 at 13:42:09).  Trooper Moremen said that he did not deal with large quantities of narcotics and that he was going to call other law enforcement agents to take over the case at that point.  (Gov. Ex. 2 at 13:42:15).  Trooper Moremen asked if Santana would be willing to talk to someone if he called them to the scene, and she responded, "What can I say?"  (Gov. Ex. 2 at 13:42:30-13:42:40).  Santana then stated for the third time that she was not aware of the contents of the duffel bag.  (Gov. Ex. 2 at 13:42:48).  Santana asked to call her mother, and Trooper Moremen responded that she was not making any phone calls now.  (Gov. Ex. 2 at 13:42:50).  Trooper Moremen placed the black duffel bag back in the rear seat and continued to search the vehicle.  See (Gov. Ex. 2).

Santana requested a drink of water approximately three minutes later, and Trooper Moremen retrieved a bottle of water from her vehicle and assisted her in drinking it.  (Gov. Ex. 2 at 13:46:04-13:46:40).  Trooper Moremen informed her that he had called an investigator, and Santana once again denied any knowledge of the contents of the duffel bag.  (Gov. Ex. 2 at 13:46:48-13:47:05).  Trooper Moremen again removed the duffel bag and placed it on the hood of his patrol car, and he completed

paper work, while another trooper continued to search the vehicle.  See (Gov. Ex. 2).

When Trooper Moremen asked how he could view the photograph of her driver's

license on her cell phone in order to take a picture of it, Santana provided him the

code to her cell phone.  (Gov. Ex. 2 at 13:49:20-13:50:09).  Santana again asked about

making a phone call, and Trooper Moremen stated that he would let the agent who

would soon be arriving on the scene decide whether she could make a phone call.

(Gov. Ex. 2 at 13:50:38).  At some point during the inventory of the vehicle, another

trooper on the scene located a small purse with some money in it, (Gov. Ex. 2 at

13:54:07), and Trooper Moremen asked Santana who the purse belonged to, told her

it had some money in it, and then asked her to watch him put it in her larger purse,

which was on the hood of his patrol vehicle, (Gov. Ex. 2 at 13:54:15-13:54:51).  He

again commented on the odor of marijuana coming from Santana's purse, (Gov. Ex.

2 at 13:54:54), and Santana repeated that she did not know what was in the duffle

bag, (Gov. Ex. 2 at 13:55:10).

Approximately thirty minutes after the traffic stop was initiated, DEA agents

arrived at the scene.  (Gov. Ex. 2 at 13:57:41; Tr. at 138).  Santana was placed in

Trooper Moremen's patrol vehicle and transported to a DEA facility to be

interviewed.  (Gov. Ex. 2 at 14:03:15; Tr. at 18, 48, 105, 138).  The drive from the

location of the traffic stop on Interstate 85 to the DEA facility lasted about six

minutes.  (Gov. Ex. 2 at 14:11:43-14:17:48).  Trooper Moremen cited Santana for driving on a suspended license and for trafficking, and he also gave her warnings for a window tint violation and for failure to maintain lane.  (Tr. at 80; Def. Ex. 2).[9]

At that point, Santana was turned over to the DEA's custody, and agents walked her into the DEA Strike Force Building and placed her in an interview room, where she waited with a task force officer approximately 15 minutes before being interviewed.  (Tr. at 138-139, 151).  DEA Special Agents Telita Huffman ("Agent Huffman") and Danya Johnson ("Agent Johnson") joined the task force officer and Santana in the interview room, and at the beginning of the interview conducted by Agents Huffman and Johnson, Agent Huffman obtained biographical information from Santana and then verbally reviewed a packet of documents with her that included a waiver of <u>Miranda</u> rights[10] and a form granting permission to search

---

[9] Trooper Moremen testified that while at the scene and after arresting Santana, he measured the tint on the vehicle's windows at 30 percent using a tint meter.  (Tr. at 91-94).  He also testified that the allowable tint in Georgia was "32 percent plus or minus 3 percent depending on the manufacturer of the window." (Tr. at 95).  On March 14, 2018, Federal Defender Program Staff Investigator V.J. Henville ("Inv. Henville") performed a tint inspection on the windows of Santana's vehicle using the Tint Meter 200, after reviewing the instructions and calibrating the machine.  (Tr. at 157-58, 160).  The Tint Meter 200 gave a reading of 35 percent for both of the front windows.  (Tr. at 162).

[10] Agent Huffman testified that although she went over the form waiver of <u>Miranda</u> rights with Santana, who signed the form, agreeing to waive her <u>Miranda</u> rights, the actual form was unable to be located and turned over to the United States Attorney's Office.  (Tr. at 110-18, 142-44).

Santana's cell phone.[11]  (Tr. at 109-18, 122, 152-53; Gov. Exs. 4 & 5).  Santana signed

both the Miranda waiver and the consent-to-search forms in the presence of Agents

Huffman and Johnson.  (Tr. at 109-12, 117-18, 139-44; Gov. Ex. 4).  Santana was

informed that this was her chance to come forward with information that would

help her.  (Tr. at 155).  While Agent Huffman testified that Santana was handcuffed

throughout the interview, (Tr. at 136), Agent Johnson testified that she was not

handcuffed or shackled during the interview, (Tr. at 145).

After completing the aforementioned forms, Santana cried for about five

minutes at the beginning of the interview, but thereafter, the agents observed no

---

[11] The consent to search form specifically stated:

I, [Santana], hereby grant my consent to Agent(s) [Huffman and Johnson] of the [DEA] to search the mobile telephone(s) found on my person or in my vehicle including the address book, call history logs, photographs, videos, text messages and other data contained in the telephone(s).  To facilitate this search, I understand that the agents may digitally copy to and retain this data on a computer or other electronic device.

. . . .

I understand that I have the right to refuse the consent to search described above and to refuse to sign this form.  I further state that no promises, threats, force, physical or mental coercion of any kind have been used against me to get me to consent to the search of the mobile telephone(s).

(Gov. Ex. 4).

evidence that Santana was having trouble understanding the process or their questions, was uncomfortable, or had changed her mind about waiving her rights or consenting to the search of her cell phone.  (Tr. at 121-23, 143, 145-46).  Agents Huffman and Johnson testified that they did not threaten Santana or offer her anything in exchange for her statements.  (Tr. at 122, 143-44).  During the course of the interview with Agents Huffman and Johnson, "Santana admitted that she knew there [were] narcotics in the vehicle," though she stated that she did not know exactly what it was or how much, and that "she was doing it because she needed the money[.]"  (Tr. at 120).  She further admitted that this was the second time she had transported drugs for an individual named "Chino."  (Tr. at 120-21).  The interview lasted between 45 minutes and an hour, (Tr. at 123, 148), and Santana was then transported to the Atlanta City Detention Center for processing, (Tr. at 120).

## II.  DISCUSSION

Santana moves to suppress evidence that was obtained as a result of the traffic stop and subsequent search of her vehicle following her arrest on October 27, 2017, which she contends violated the Fourth Amendment.  See [Doc. 45 at 13-31]; see also [Doc. 20].  She also moves to suppress statements she made after her arrest that day, arguing that she was questioned in violation of Miranda, which "undermines not only the initial phase of Trooper Moremen's post-arrest questioning but the

subsequent questioning by [him] and the DEA agents as well," [Doc. 45 at 36], and that she did not voluntarily waive her <u>Miranda</u> rights during the interview, [<u>id.</u> at 37-39]; <u>see also</u> [Doc. 21].  Santana further moves to suppress any evidence obtained from the search of her cell phone, contending that she did not voluntarily consent to the search of her phone.  [Doc. 45 at 39-41].  The government responds that "the traffic stop was valid based on reasonable suspicion of criminal activity and probable cause that a traffic violation had occurred," and the "search of the vehicle was valid under the automobile exception to the search warrant requirement of the Fourth Amendment and pursuant to Georgia Department of Public Safety policies governing searches of impounded vehicles."  [Doc. 48 at 1-2].  The government also argues that "Santana was twice read her *Miranda* rights" and her statements "are admissible because she spoke knowingly, intelligently, and voluntarily," and her grant of consent to search her cell phone was "knowing and uncoerced."  [<u>Id.</u> at 2, 21 (emphasis omitted)].

A.    <u>Reasonable Suspicion/Probable Cause to Initiate the Traffic Stop</u>

"The Fourth Amendment protects individuals from unreasonable search and seizure."  <u>United States v. Rowls</u>, 402 F. App'x 467, 468 (11th Cir. 2010) (per curiam) (unpublished) (citation and internal marks omitted).  The "[t]emporary detention of individuals during the stop of an automobile by the police, even if only for a brief

period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of [the Fourth Amendment]." Whren v. United States, 517 U.S. 806, 809-10 (1996) (citations omitted); see also United States v. Purcell, 236 F.3d 1274, 1277 (11th Cir. 2001); United States v. Edenilson-Reyes, Criminal Action File No. 1:09–CR–00361–RWS–AJB, 2010 WL 5620439, at *9 (N.D. Ga. Oct. 26, 2010), adopted by 2011 WL 195679, at *1 (N.D. Ga. Jan. 20, 2011).

A traffic stop is reasonable if the officer had probable cause to believe that a traffic violation has occurred, or if the traffic stop is justified by reasonable suspicion in compliance with Terry v. Ohio, 392 U.S. 1 (1968). Edenilson-Reyes, 2010 WL 5620439, at *9 (citing United States v. Spoerke, 568 F.3d 1236, 1248 (11th Cir. 2009); Purcell, 236 F.3d at 1277); see also United States v. Monzon-Gomez, 244 F. App'x 954, 959 (11th Cir. 2007) (per curiam) (unpublished); United States v. Simmons, 172 F.3d 775, 778 (11th Cir. 1999); United States v. Sierra, Cr. No. 2:10cr183–MEF, 2011 WL 1675217, at *2 (M.D. Ala. Apr. 19, 2011), adopted by 2011 WL 1675180, at *1 (M.D. Ala. May 4, 2011), aff'd by 501 F. App'x 900 (11th Cir. 2012) (per curiam) (unpublished). Thus, "[a] traffic stop . . . is constitutional if it is either based upon probable cause to believe a traffic violation has occurred or justified by reasonable suspicion. . . ."[12] Edenilson-Reyes, 2010 WL 5620439, at *9 (alterations in original)

_____

[12] Probable cause must be supported by more than a mere suspicion, but does not require the same "'standard of conclusiveness and probability as the facts

(citations and internal marks omitted); see also United States v. Boyd, 388 F. App'x 943, 947 (11th Cir. 2010) (per curiam) (unpublished); United States v. Woods, 385 F. App'x 914, 915 (11th Cir. 2010) (per curiam) (unpublished).  The government bears the burden of presenting facts to establish that the traffic stop is supported by reasonable suspicion or probable cause.  See Welsh v. Wisconsin, 466 U.S. 740, 749-50 (1984); see also United States v. Kelly, No. 1:13–cr–108–WSD–JSA, 2014 WL 1153375, at *8 (N.D. Ga. Mar. 21, 2014), adopted at *4 (citations omitted).

An officer's subjective intentions and motives are irrelevant where the officer has probable cause for the stop.  See United States v. Mwangi, Criminal File No. 1:09-CR-107-TWT, 2010 WL 520793, at *3 n.9 (N.D. Ga. Feb. 5, 2010), adopted at *1 (citations omitted); see also United States v. Arango, 396 F. App'x 631, 632-33 (11th Cir. 2010) (per curiam) (unpublished) (citation and internal marks omitted) ("Where objectively reasonable conditions permit a stop, the officer's motive in making the traffic stop does not invalidate what is otherwise objectively justifiable behavior under the Fourth Amendment."); Miller v. Harget, 458 F.3d 1251, 1260 (11th Cir. 2006) (citations omitted) ("It is well-settled that an officer's subjective motivations

---

necessary to support a conviction.'" United States v. Dunn, 345 F.3d 1285, 1290 (11th Cir. 2003) (quoting Wood v. Kesler, 323 F.3d 872, 878 (11th Cir. 2003)).  Reasonable suspicion is a less demanding standard than probable cause and requires only a fair probability that illegal activity has occurred.  United States v. Sokolow, 490 U.S. 1, 7 (1989).

do not affect whether probable cause existed"); United States v. Jimenez, No. 2:06-cr-74-FtM-29DNF, 2006 WL 2927477, at *2 (M.D. Fla. Oct. 11, 2006) (holding that "an officer's belief that he has probable cause or does not have probable cause is simply not a pertinent factor" in determining whether an arrest is lawful). That is, "if the driver of a car has broken a traffic law, no matter how relatively minor, a motion to suppress evidence cannot be based on the argument that the stop was pretextual." United States v. Wright, No. CR210-022, 2010 WL 4967468, at *1 (S.D. Ga. Nov. 5, 2010), adopted by 2010 WL 4967838, at *1 (S.D. Ga. Dec. 1, 2010) (citation omitted). Moreover, "[t]he propriety of the traffic stop [] does not depend on whether the defendant is actually guilty of committing a traffic offense." United States v. Sicairos-Sicairos, Criminal Action File No. 4:10–CR–054–HLM, 2011 WL 2710031, at *5 (N.D. Ga. July 11, 2011) (citation omitted). "Instead, the relevant question is whether it was reasonable for the officer to believe that a traffic offense had been committed." Id. (citation omitted).

Santana argues that the traffic stop was not supported by probable cause. [Doc. 45 at 13-18]. In particular, she first asserts that while Trooper Moremen said he could not tell if she was wearing a seat belt because of the dark window tint, "once he approached her window on foot, he saw her take the seat belt off," so "the seat belt was no problem, he said." [Id. at 13 (citation omitted)]. She also asserts

18

that while Trooper Moremen stated she was weaving all over her lane, the "aerial video does not corroborate [his] contention about [her] failing to maintain lane." [Id.].  Santana further asserts that "the tint on her vehicle was not in violation of law."  [Id. at 13-14].

Contrary to Santana's contention, the Court finds that Trooper Moremen had probable cause to believe that the dark tint on Santana's windows violated O.C.G.A. § 40-8-73.1, which provides in relevant part:

> Except as provided in this Code section, it shall be unlawful for any person to operate a motor vehicle in this state:
>
> (1) Which has material and glazing applied or affixed to the front windshield, which material and glazing when so applied or affixed reduce light transmission through the windshield; or
>
> (2) Which has material and glazing applied or affixed to the rear windshield or the side or door windows, which material and glazing when so applied or affixed reduce light transmission through the windshield or window to less than 32 percent, plus or minus 3 percent, or increase light reflectance to more than 20 percent.

O.C.G.A. § 40-8-73.1(b).  Trooper Moremen testified that, despite positioning his patrol vehicle where he could view Santana's driver side window, he was not able to determine whether she was wearing a seat belt because of the dark tint on her windows.  (Tr. at 58, 83).  His testimony is consistent with the aerial surveillance and dash camera video recordings that show him approaching the driver's side window while in the lane to the left of Santana's vehicle, then navigating to travel behind

19

Santana, initiating the traffic stop, and stating aloud over the radio that he was stopping the vehicle for weaving within its lane and because the vehicle appeared to have dark window tint, not allowing him to see if the driver was wearing a seat belt.  (Gov. Ex. 1 at 22:10-22:47; Gov. Ex. 2 at 13:26:23-13:26:35); see also (Gov. Ex. 2 at 13:32:32-13:32:37 (informing a back up officer who responded to the traffic stop that he had stopped Santana for window tint and failure to maintain lane)).  The "Court credits the testimony of [Trooper Moremen], and finds that he reasonably believed that [Santana] . . . had illegal window tint in violation of O.C.G.A. §[] . . . 40-8-73.1," United States v. Whitlock, CRIMINAL ACTION FILE NO. 4:08-CR-00044-RLV-WEJ, 2009 WL 10670976, at *5 (N.D. Ga. Apr. 22, 2009), adopted by 2009 WL 10676345, at *1 (N.D. Ga. June 15, 2009), aff'd, 493 F. App'x 27 (11th Cir. 2012) (per curiam) (unpublished), and thus, Trooper Moremen "had probable cause for the stop, regardless of whether the tinting was actually illegal," United States v. Garcia, 284 F. App'x 791, 793 (11th Cir. 2008) (per curiam) (unpublished) (citations omitted) (finding that the "district court did not err, much less plainly err, by finding that probable cause existed for the traffic stop" where "[a]t the time he decided to stop [defendant's] truck, [the] Officer [] knew that: (1) Georgia law prohibited excessively tinted windows; (2) he could not see inside the vehicle; and (3) he could not see the driver," which "was sufficient to lead a reasonable officer to believe that

[defendant] had violated [O.C.G.A.] § 40-8-73.1(b) by operating a motor vehicle with window tinting that exceeded the allowable limits").[13]

Santana argues that "the tint on her vehicle was not in violation of [Georgia] law." [Doc. 45 at 13-14]. In particular, Santana points to the warning issued by Trooper Moremen that stated the degree of window tint was 30 percent, claiming that "it is unclear that such a reading would evidence a violation of the law" given that "the legal limit for window tint in Georgia is 32 percent plus or minus three percent[.]" [Id. at 16]. She also points to Inv. Henville's subsequent examination of the window tint on the vehicle that showed "readings of 35 percent," which she contends "are clearly within the allowable limit under Georgia law." [Id.].

---

[13] "Since the Court concludes probable cause supported [Trooper Moremen's] decision to stop [Santana's] vehicle, the stop also was supported by reasonable suspicion, a lesser degree of proof than probable cause." United States v. Shirley, Criminal Action File No. 1:10-CR-167-JEC/AJB, 2010 WL 5390138, at *5 n.8 (N.D. Ga. Nov. 10, 2010), adopted by 2010 WL 5390133, at *1 (N.D. Ga. Dec. 22, 2010); see also United States v. Moody, 240 F. App'x 858, 859 (11th Cir. 2007) (per curiam) (unpublished) (finding the officer "reasonably believed, based on his eight years of experience enforcing the window tint statute, that [defendant's] windows were in violation of the window tint law when he observed that he could not (1) see the front passenger's facial features or (2) determine the number of passengers in the back seat" and "[b]ecause he had a reasonable suspicion that the car was in violation of Georgia law, the stop did not violate the Fourth Amendment"); United States v. Johnson, No. CR05-4063-MWB, 2005 WL 2704892, at *7 (N.D. Iowa Oct. 20, 2005) (citation omitted) (Officer's "observation of the darkly tinted windows on the [vehicle] provided him with at most probable cause and no less than reasonable suspicion to believe that the [vehicle's] windows had an excessive tint, in violation of [state] law, justifying stop of the vehicle.").

However, her argument is "'unpersuasive, as it appears to confuse the standards for probable cause with those for a violation.'"  United States v. Reyes, Criminal Case Nos. 1:11-cr-00009-ODE-RGV, 1:11-cr-00060-ODE-RGV, 2011 WL 7070980, at *6 (N.D. Ga. Aug. 29, 2011), adopted by 2012 WL 176488, at *6 (N.D. Ga. Jan. 19, 2012) (quoting United States v. Alvardo, No. 8:10-CR-348-T-30TGW, 2010 WL 5262736, at *4 (M.D. Fla. Nov. 17, 2010), adopted by 2010 WL 5262735, at *1 (M.D. Fla. Dec. 17, 2010)).  "Indeed, '[t]he Eleventh Circuit rejected this argument, stating that police do not have to ascertain conclusively whether a window-tint violation has occurred before there is probable cause to investigate it.'"  Id. (alteration in original) (quoting Alvardo, 2010 WL 5262736, at *4); see also United States v. Weaver, 145 F. App'x 639, 641 (11th Cir. 2005) (per curiam) (unpublished).  "In fact, 'the Eleventh Circuit noted that no officer knows the window transmittance percentage based on observation and, thus, if such knowledge was required to establish probable cause, an officer could never stop a vehicle for a violation of this statute independent of another infraction.'"  Reyes, 2011 WL 7070980, at *6 (citation omitted); see also Weaver, 145 F. App'x at 64; Georgia v. Simmons, 640 S.E.2d 709, 712 (Ga. Ct. App. 2006) (citing Ciak v. Georgia, 597 S.E.2d 392, 396 (Ga. 2004)) (noting that the Georgia Supreme

Court has "held that a traffic stop is not rendered improper simply because a field test showed that the window tint did *not* violate the statute").[14]

Whether the stop of Santana for failure to maintain her lane of travel was supported by probable cause "presents a much closer call." United States v. Latimore, Criminal Action File No. 1:13-cr-287-TCB, 2014 WL 3109183, at *15 (N.D. Ga. July 7, 2014), adopted at *1. Georgia law provides that "'[a] vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety[.]'" Acree v. Georgia, 737 S.E.2d 103, 104–05 (Ga. Ct. App. 2013) (last alteration in original) (quoting O.C.G.A. § 40-6-48(1)).   Trooper Moremen

_____

[14] Santana contends that Trooper "Morem[e]n did not assert to [her] that she had an illegal tint on the vehicle windows" and that the "record [] shows that, if anything, the degree of tint on [her] windows was an afterthought," as the "degree of window tint was only a consideration to the extent it related to Trooper Morem[e]n's ability to see whether [she] had on a seat belt." [Doc. 45 at 16-17]. Santana, however, admits that Trooper Moremen "did ultimately give her a warning for a window tint violation." [Id. at 16]; see also (Def. Ex. 2). And, Trooper Moremen referenced the dark tint on the windows when he reported over the radio the reason he was pulling over the vehicle and when he informed Santana why he had pulled her over and stated that he was unable to see if she was wearing a seat belt due to the window tint. (Gov. Ex. 2 at 13:26:23-13:26:35, 13:28:05-13:28:22). He also informed a backup officer, who responded to the traffic stop, that one of the reasons he had stopped the vehicle was for dark window tint. (Gov. Ex. 2 at 13:32:32-13:32:37). While Trooper Moremen did not specifically state he was pulling Santana over for "illegal tint," [Doc. 45 at 16-17], it is clear from the video recording of the traffic stop and the warning issued that Santana's window tint was not an "afterthought," and Santana's assertion is without merit.

testified that Santana weaved within her lane and touched the dividing lines on at least three occasions.  (Tr. at 57-58, 97).  While "touching the lane line is a factor that may, in combination with other conduct, give rise to probable cause justifying a traffic stop under O.C.G.A. § 40-6-48(1)," United States v. Bryson, Criminal Case No. 1:13-CR-09-ODE-GGB, 2013 WL 5739055, at *4 (N.D. Ga. Oct. 21, 2013) (citing Acree, 737 S.E.2d at 105; Polk v. Georgia, 700 S.E.2d 839, 841 (Ga. Ct. App. 2010); Allenbrand v. Georgia, 458 S.E.2d 382, 383 (Ga. Ct. App. 1995)), "in the absence of such additional conduct, the mere touching of the white dashed line between two or more clearly marked lanes is insufficient to support probable cause to believe that a violation of O.C.G.A. § 40-6-48(1) has occurred," id. (footnote omitted).  "Because [Santana's] conduct in the instant case involved nothing more than touching the lane line on [three] occasions, Trooper [Moremen] lacked probable cause, at the time he initiated the traffic stop, to believe a violation of O.C.G.A. § 40–6–48(a) had been committed."  Id.; see also Latimore, 2014 WL 3109183, at *16 (footnote omitted) (finding that defendant "at most [] touched the white dashed line on the right hand side of his traffic lane three times," and that "was insufficient to constitute probable cause to believe [he] violated [O.C.G.A.] § 40-6-48(1)").  "Nor did [Santana's] touching the line three times give rise to reasonable suspicion" since "there was no testimony or evidence of other conduct or conditions that objectively gave rise to a

reasonable suspicion that [Santana] was driving under the influence." Latimore, 2014 WL 3109183, at *16 (footnote omitted); see also United States v. Hernandez, 17 F. Supp. 3d 1255, 1258 (N.D. Ga. 2014) (footnote omitted) (concluding that the traffic stop was not "justified based on probable cause or reasonable suspicion due to Defendant's driving conduct" where vehicle only touched the lane dividing lines and there was "no other 'additional' conduct or conditions that would suggest the driver's intoxication or other conduct whatsoever indicating a safety risk or traffic violation"). "Thus, the Court concludes that the only legitimate basis for the traffic stop was to investigate [Santana's window tint]." Latimore, 2014 WL 3109183, at *17.

Santana claims that "Trooper Morem[e]n's motivations must be taken into account in assessing his credibility with regard to bases for the stop" since he "wanted to stop the car, and he was looking for any reason to do so." [Doc. 45 at 17-18]. However, Santana's argument is unavailing because, as previously stated, an officer's subjective intentions and opinions are irrelevant where the officer has probable cause for the stop, see Mwangi, 2010 WL 520793, at *3 n.9 (citations omitted); see also Arango, 396 F. App'x at 632-33 (citation omitted). "Having probable cause to stop [Santana] for a traffic offense, it was irrelevant that [Trooper Moremen] was primarily looking to stop the vehicle based on [the DEA agents']

instruction." <u>Reyes</u>, 2011 WL 7070980, at *6.  "In short, [Trooper Moremen's] testimony established that he had probable cause to believe that the window tinting on [Santana's] vehicle violated Georgia law, which is 'all that is necessary to conduct a traffic stop.'"  <u>Id.</u> (footnote and citations omitted) (quoting <u>Alvardo</u>, 2010 WL 5262736, at *5).

Even were the Court to conclude that Santana's window tint did not provide Trooper Moremen with probable cause to initiate the traffic stop, "the stop of [her] vehicle was justified by reasonable suspicion based on information obtained through the agents' collective investigation and surveillance." <u>United States v. Goldenshtein</u>, Criminal Case No. 1:10-CR-00323-TCB-RGV, 2011 WL 1321573, at *10 (N.D. Ga. Feb. 22, 2011), adopted by 2011 WL 1257147, at *1 (N.D. Ga. Apr. 1, 2011).  As previously stated, "[p]robable cause is not required to justify an investigative stop; reasonable suspicion is sufficient."  <u>United States v. Pineda-Zuniga</u>, CRIMINAL CASE NUMBER: 1:16-CR-00323-2-LMM-JSA, 2017 WL 9477640, at *5 (N.D. Ga. Aug. 18, 2017), adopted by 2017 WL 4074785, at *3 (N.D. Ga. Sept. 14, 2017) (footnote and citations omitted).  "In deciding whether there is reasonable suspicion, the Court is to consider the collective knowledge of all law enforcement officers working together, to the extent they maintained at least a minimal level of communication

during their investigation." Id. (citing United States v. Willis, 759 F.2d 1486, 1494 (11th Cir. 1985)).

In this case, agents conducting surveillance observed the black Mazda driven by Santana park next to the CS's vehicle at the predetermined location of the transaction, a duffel bag containing methamphetamine and sham drugs was moved from the CS's vehicle and placed in the rear seat of Santana's vehicle, and she then left the parking lot and was monitored via aerial surveillance until Trooper Moremen initiated the traffic stop. (Tr. at 10-13, 17, 27, 33-36; Gov. Ex. 1). Trooper Moremen had been briefed on the anticipated delivery of the duffel bag containing methamphetamine, and he was in constant communication with the agents conducting surveillance of the transaction, (Tr. at 11-13, 16, 52-53), and these "facts provided a specific, concrete, and quite strong basis to conclude that criminal activity was afoot, and that [Santana's vehicle] was transporting evidence," Pineda-Zuniga, 2017 WL 9477640, at *5; see also Goldenshtein, 2011 WL 1321573, at *11. Thus, the "stop was justified at least by reasonable suspicion." Pineda-Zuniga, 2017 WL 9477640, at *5 (footnote and citations omitted); see also United States v. Bully, 729 F. App'x 671, 675 (11th Cir. 2018) (per curiam) (unpublished) (finding agents had reasonable suspicion to initiate a traffic stop after defendant accepted a package containing sham drugs and later exited the residence); United States v.

Nunez, 455 F.3d 1223, 1226 (11th Cir. 2006) (per curiam) (finding stop was based on reasonable suspicion since defendant was seen entering a house known to contain a marijuana growing operation and subsequently left with a garbage bag); United States v. Khan, CRIMINAL CASE NO. 1:17-CR-0040-SCJ, 2018 WL 2214813, at *7 (N.D. Ga. May 15, 2018) (finding officers had probable cause to stop vehicle where "prior to the traffic stop of [d]efendant's car, [the] [t]rooper [] had been contacted by the DEA and was told that someone would be bringing Spice (synthetic marijuana); that on the date in question, [he] was on stand-by at the DEA's request; that [he] had a DEA radio mounted in his car; that the DEA was communicating with [him] by radio on the day of the [d]efendant's traffic stop; and that [he] knew what was happening via the updates over the DEA radio").  Accordingly, Trooper Moremen had probable cause to stop Santana, and the stop was also justified by reasonable suspicion.

**B.** **Search of the Vehicle**

Santana argues that the impoundment and search of her vehicle were not constitutionally valid, and thus, all evidence that the government acquired must be suppressed. [Doc. 45 at 18].  The government responds that, after Trooper Moremen made the decision to arrest Santana for driving on a suspended license, he was justified in impounding the vehicle and performing an inventory search pursuant

to GSP policy for the safeguarding of her property.   [Doc. 48 at 14-16].   The government also argues that "[e]ven in the absence of a standard [GSP] policy on inventory searches, Trooper Morem[e]n was justified in searching Santana's vehicle upon her arrest because he had probable cause to believe that the vehicle contained evidence of criminal activity, thus [] satisfying the automobile exception."   [Id. at 17 (citations omitted)].[15]

"Under the automobile exception, agents may conduct a warantless search of a vehicle if (1) the vehicle is readily mobile (i.e., operational); and (2) agents have probable cause to believe the vehicle contains contraband or evidence of a crime." United States v. Tamari, 454 F.3d 1259, 1261 (11th Cir. 2006).   "The legality of a warrantless automobile search is based on the existence of probable cause to believe

---

[15] The government argues that the search of Santana's vehicle was pursuant to an inventory, but "[i]n order to uphold a search under the inventory search doctrine, the police must first have the authority to impound the vehicle and must then follow the procedures outlined in their standardized policy." United States v. Moore, No. 2:05-CR-50-FTM-29, 2006 WL 560640, at *6 (M.D. Fla. Mar. 7, 2006) (citing Colorado v. Bertine, 479 U.S. 367, 375 (1987); United States v. Williams, 936 F.2d 1243, 1248 (11th Cir. 1991)).   "The government bears the burden of proving these elements." Id. (citing Sammons v. Taylor, 967 F.2d 1533, 1543 (11th Cir. 1992)). "To prove standardized criteria, the government may rely on written regulations or testimony concerning standard practices." United States v. Miller, 382 F. Supp. 2d 350, 377 (N.D.N.Y. 2005) (citations omitted).   While the government presented written procedures and elicited testimony at the evidentiary hearing concerning the officers' standard practices with regard to the impound and inventory of a vehicle, (Tr. at 68-71, 73, 100-01; Gov. Ex. 3), the Court need not address this argument as it finds that the search of the vehicle was supported by probable cause.

that the automobile is carrying contraband subject to forfeiture under the law, and

the difficulties of securing a moveable vehicle while a warrant is obtained." United

States v. Thomas, 536 F. Supp. 736, 742 (M.D. Ala. 1982); see also Chambers v.

Maroney, 399 U.S. 42, 51-52 (1970); United States v. Alexander, 835 F.2d 1406, 1409

(11th Cir. 1988).

Probable cause to search exists "'when the facts and circumstances would lead

a reasonably prudent [person] to believe that the vehicle contains contraband.'"

Alexander, 835 F.2d at 1409 (alteration in original) (quoting United States v. Clark,

559 F.2d 420, 424 (5th Cir. 1977)[16]).  In determining whether probable cause exists,

the Court "may examine the collective knowledge of the officers 'if they maintained

at least a minimal level of communication during their investigation.'" United States

v. Olmedo, 552 F. Supp. 2d 1347, 1357 (S.D. Fla. 2008) (quoting Willis, 759 F.2d at

1494).  Thus, under the automobile exception, a warrantless search of a vehicle does

not violate the Fourth Amendment 'if the vehicle is operational and 'under the

totality of the circumstances, there is a fair probability that contraband or evidence

of a crime will be found' in the vehicle." Tamari, 454 F.3d at 1262 (quoting United

States v. Goddard, 312 F.3d 1360, 1363 (11th Cir. 2002)).  The automobile exception

---

[16] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc),
the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth
Circuit rendered prior to October 1, 1981.

authorizes law enforcement to "search all parts of the vehicle, and any containers

therein, where the object of the search might be found." United States v. Baldwin,

774 F.3d 711, 720 (11th Cir. 2014).

Santana's vehicle "was clearly operational such that it was a 'readily mobile'

vehicle," as Trooper Moremen "had followed it down the interstate . . . before

pulling it over [on the shoulder of the interstate]. . ., where it stopped with no

indication it had ceased to be operational." United States v. Petit, 2:16-cr-00319-

AKK-JHE-2, 2017 WL 2060005, at *6 (N.D. Ala. Mar. 19, 2017), adopted by 2017 WL

2001705, at *1 (N.D. Ala. May 12, 2017). "Likewise, probable cause existed to believe

that the vehicle contained contraband or evidence of a crime, including the [drugs

from] the [controlled delivery] that occurred less than an hour before the traffic

stop."      United States v. Everett, CRIMINAL ACTION FILE NO.

1:17-CR-020-RWS-JKL, 2018 WL 2189763, at *10 (N.D. Ga. Mar. 30, 2018), adopted

by 2018 WL 2187407, at *1 (N.D. Ga. May 10, 2018). At the time Trooper Moremen

began his search of the vehicle, he had participated in a briefing with DEA agents

that morning regarding the plan for the controlled delivery, he had seen the duffel

bag containing the drugs and was told which specific bundles were

methamphetamine and which were sham, he had remained in communication with

the agents conducting surveillance, who had maintained visual contact with the

vehicle between the controlled delivery and the traffic stop, he had received confirmation that the duffel bag had been placed in the black Mazda driven by Santana, he was given a physical description of the vehicle and its license plate number, he had established visual contact with the vehicle that had the same description and license plate number, and after stopping the vehicle, he saw the duffel bag that he was shown earlier in the day sitting on the back passenger side seat, (Tr. at 7-10, 23, 29, 51-53, 58, 62, 72-73), all of which provided probable cause to believe that drugs would be found in Santana's vehicle, see United States v. Lindsey, 482 F.3d 1285, 1293 (11th Cir. 2007) (finding the "police had probable cause to search the vehicle: they knew [d]efendant was a felon and that he owned the SUV; and, given the events at the gas station, a fair probability existed that the vehicle contained a firearm based on the totality of the circumstances").

Even if Trooper Moremen's "individual knowledge did not supply probable cause," the collective knowledge of the DEA agents and the participating troopers at the time of the traffic stop, which included the communications between the CS and the person who made arrangements to meet at the L.A. Fitness parking lot for the purchase of eleven kilograms of methamphetamine on October 27, 2017, and the DEA agents' observations of the CS meeting with Santana at the planned location, where the duffle bag was moved from the CS's vehicle to the black Mazda Santana

was driving, which was communicated to Trooper Moremen, who subsequently saw the duffle bag in plain sight on the rear seat of the Mazda before beginning his search, "was sufficient for probable cause under these circumstances." Petit, 2017 WL 2060005, at *6; see also Hernandez, 17 F. Supp. 3d at 1260 (citations omitted) (finding where "the officers with knowledge of the investigation [], in effect directed [another officer], who was aware of a bare minimum information of the facts of the federal investigation, to conduct a traffic stop if feasible based on [the officer's] reasonable suspicion of [d]efendant's prostitution activity" were circumstances "sufficient to trigger the collective knowledge doctrine"); Goldenshtein, 2011 WL 1321573, at *12 (citations omitted) (applying collective knowledge doctrine and denying defendants' motions to suppress evidence seized during a traffic stop where the officer "knew at the time of the stop that [] agents suspected that defendants were smuggling narcotics by airplane, that they wanted his assistance with making the stop, that the plane associated with the defendants had landed at night shortly before the stop, that the pilot was met by the driver of a vehicle that was described to him via radio, that [] agents had conducted surveillance on the plane and the vehicle, that they wished for him to stop the vehicle as it left the airport, that a vehicle matching the description given by the [] agents left the airport at exactly the time given, and that the vehicle made a sudden U-turn almost

33

immediately after [the] Officer [] pulled in behind it"); United States v. Rodriguez-Alejandro, 664 F. Supp. 2d 1320, 1339-40 (N.D. Ga. 2009) (footnote and citations omitted) (finding officer had probable cause to search the tractor-trailer and seize suitcase therein because "collective knowledge of the participating law enforcement officers at the time of the traffic stop included the wiretap information detailing the transactions to take place, the use of coded language that the agents knew referred to the drug trade, the prior surveillance and seizure under similar circumstances, the surveillance of the tractor-trailer, the Impala, the white Chevy van, and the white pickup truck on April 21, including observing the suitcase being removed from the van that traveled from 3241 Hamilton Road to the warehouse and placed onto the flatbed trailer, and the continuous surveillance of the tractor-trailer until the time of the traffic stop"); Olmedo, 552 F. Supp. 2d at 1357.

"Under the totality of the circumstances, [Trooper Moremen] had probable cause to search [Santana's vehicle] and to seize the [duffel bag] located within the [vehicle]." Rodriguez-Alejandro, 664 F. Supp. 2d at 1340 (citations omitted); see also United States v. Pineda, No. 1:06-cr-350-WSD, 2008 WL 686239, at *10-11 (N.D. Ga. Mar. 10, 2008), adopted at *4 (finding collective knowledge of officers conducting wiretap surveillance of drug trafficking organization followed by the observations of defendant actually engaging in activity expressed during the intercepted calls

gave officers sufficient probable cause to search vehicle); United States v. Jackson, 548 F. Supp. 2d 1314, 1320-21 (M.D. Fla. 2008), adopted at 1317 (finding probable cause to search vehicle existed based on the information learned through the wiretap and earlier surveillance confirming information).[17]   Because the traffic stop was lawful and there was independent probable cause to search Santana's vehicle and the duffle bag therein, it is **RECOMMENDED** that Santana's motion to suppress, [Doc. 20], be **DENIED**.

## C.   Santana's Statements

Recognizing that the government "has expressed that it will not seek to introduce at trial statements that [she] made after being arrested but before Trooper Morem[e]n read her Miranda warnings," Santana moves to suppress her "statements concerning her alleged offense conduct to Trooper Morem[e]n and the DEA Agents," [Doc. 45 at 36], asserting that Trooper Moremen questioned her "after arresting her but before providing her with Miranda warnings," [id. at 34], and that his "failure to Mirandize [] Santana at the outset of his questions undermines not

---

[17] In her reply brief, Santana argues that "Trooper Morem[e]n did not search [her] vehicle based upon an assertion of probable cause," but instead he "searched it based upon an inventory rationale."   [Doc. 55 at 3].   However, "a pretextual inventory of a vehicle is irrelevant if [agents and troopers] possessed probable cause to believe that the vehicle contained evidence of a crime."   United States v. Williams, 731 F. App'x 863, 868 (11th Cir. 2018) (per curiam) (unpublished) (citation omitted). Thus, Santana's argument is unavailing.

only the initial phase of [his] post-arrest questioning but the subsequent questioning by [him] and the DEA agents as well," [id. at 36].  Santana also asserts that she did not voluntarily waive her Miranda rights during the DEA interrogation, so her statements should be suppressed.  [Id. at 37-39].  The government confirms that it "will not seek to enter into evidence at trial any statements Santana made between the time she was placed under arrest and the time T[r]ooper Morem[e]n informed her of her *Miranda* rights," but asserts that her subsequent statements are admissible because Santana "knowingly and voluntarily waived her *Miranda* rights[.]"  [Doc. 48 at 21 & n.4 (internal citations omitted)].

The ruling in Miranda requires law enforcement officers to apprise a defendant in custody of her rights before engaging in interrogation.  See Garcia v. Singletary, 13 F.3d 1487 (11th Cir. 1994).  "A defendant is in custody for the purposes of *Miranda* when there has been a 'formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'"  United States v. Brown, 441 F.3d 1330, 1347 (11th Cir. 2006) (citation omitted) (quoting California v. Beheler, 463 U.S. 1121, 1125 (1983)).  Interrogation for Miranda purposes "means 'any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating

response from the suspect.'"  <u>United States v. Gomez</u>, 927 F.2d 1530, 1538 (11th Cir. 1991) (alteration in original) (quoting <u>Rhode Island v. Innis</u>, 446 U.S. 291, 301 (1980)).

Santana clearly was in custody at the time Trooper Moremen arrested her, but Trooper Moremen did not then apprise her of her <u>Miranda</u> rights.  (Gov. Ex. 2 at 13:36:45-13:37:20; Tr. at 2, 74).   The government acknowledges that Trooper Moremen did not advise Santana of her rights until approximately three and half minutes after he placed her under arrest, and thus, it will not introduce any of the statements she made between the time she was placed under arrest and the time she was informed of her <u>Miranda</u> rights.  <u>See</u> [Doc. 48 at 6, 21 n.4]; (Tr. at 74).  While Santana moves to suppress all post-arrest statements, contending that they "are all tainted by Trooper Morem[e]n's questioning and eliciting incriminating statements from [her] post-arrest without <u>Miranda</u> warnings," [Doc. 45 at 36], the government contends that her statements were made freely and voluntarily and her waiver of her <u>Miranda</u> rights was knowingly and uncoerced, [Doc. 48 at 21].

In light of Trooper Moremen's questioning of Santana after arresting her, but prior to advising her of her <u>Miranda</u> rights, the Court must consider whether the failure to provide the warnings has any bearing on the admissibility of the statements Santana subsequently made after her oral and written waivers of <u>Miranda</u> rights.  Santana argues that all of her post-arrest statements on October 27,

2017, "are [] tainted by Trooper Morem[e]n's questioning and eliciting of incriminating statements from [her] post-arrest but without <u>Miranda</u> warnings." [Doc. 45 at 36].  Specifically, Santana argues that "Trooper Morem[e]n questioned [her] about her activities on the date of her arrest and how she came to be in possession of the black duffle bag that was on the back seat of her vehicle" before he "read <u>Miranda</u> warnings to [her]," [<u>id.</u> at 34], and that after "reading <u>Miranda</u> warnings, Trooper Morem[e]n proceeded to ask [her] questions of the same type and concerning the same subject matter that he had just asked her without benefit of <u>Miranda</u> warnings," and the "subject matter of the DEA interrogation was the same as that for Trooper Morem[e]n's questions," [<u>id.</u> at 35-36].  Thus, she asserts that the "cat was already out of the bag when Trooper Morem[e]n Mirandized [her] and continued interrogating her."  [<u>Id.</u> (citing <u>Missouri v. Seibert</u>, 542 U.S. 600 (2004))]. In response, the government contends that Santana's post-<u>Miranda</u> statements are admissible because the statements were voluntarily made after two valid <u>Miranda</u> waivers.  [Doc. 48 at 21-25].

In <u>Oregon v. Elstad</u>, 470 U.S. 298 (1985), the Supreme Court held that "even where a suspect, while in custody, has answered unwarned questions from police, the suspect still may validly waive [her] *Miranda* rights and provide admissible statements after *Miranda* warnings."  <u>United States v. Gonzalez-Lauzan</u>, 437 F.3d

1128, 1133 (11th Cir. 2006) (citing Elstad, 470 U.S. at 314).  The Supreme Court explained that "[i]t is an unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise [her] free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period."  Elstad, 470 U.S. at 309. Consequently, even where Miranda requires suppression of a voluntary but unwarned admission, "the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made."  Id.

In Seibert, 542 U.S. at 600, the Court refined its ruling in Elstad by holding that even voluntary post-Miranda statements are nonetheless inadmissible where "a two-step interrogation technique [is] used in a calculated way to undermine the *Miranda* warning."  Id. at 622 (Kennedy, J., concurring).[18]  The Eleventh Circuit has held that "the *Seibert* exception . . . is aimed at putting a stop to the deliberate use of a particular police tactic employed for the specific purpose of undermining the *Miranda* rule."  Street, 472 F.3d at 1313 (citing Seibert, 542 U.S. at 618 (Kennedy, J.,

---

[18] "Because Seibert is a plurality decision and Justice Kennedy concurred in the result on the narrowest grounds, it is his concurring opinion that provides the controlling law."  United States v. Street, 472 F.3d 1298, 1313 (11th Cir. 2006) (citing Romano v. Oklahoma, 512 U.S. 1, 9 (1994); Marks v. United States, 430 U.S. 188, 193 (1977); Gonzalez-Lauzan, 437 F.3d at 1136 n.6).

concurring)).  Thus, absent the deliberate withholding of warnings designed to circumvent Miranda, the "admissibility of postwarning statements should continue to be governed by the principles of *Elstad*[.]"  Seibert, 542 U.S. at 622 (Kennedy, J., concurring); see also Street, 472 F.3d at 1313-14; United States v. Naranjo, 426 F.3d 221, 232 (3d Cir. 2005).  And under Elstad, "[a] subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement."  470 U.S. at 314.

Trooper Moremen testified at the evidentiary hearing that "Miranda should have been read prior to asking [Santana] those questions," but that it was a temporary mental lapse on his part "that occurred in the flow of the process."  (Tr. at 74).  He further testified that when he realized his mistake, Santana was advised her Miranda rights, which occurred approximately three and half minutes after he placed her under arrest.  (Id.).  Trooper Moremen added that there was no change in Santana's statement denying that the duffle bag belonged to her between the time she first stated it until after the Miranda warnings were administered.  (Tr. at 75).  "These circumstances stand in stark contrast to the facts in Seibert: Having been awakened at 3:00 a.m., the suspect in Seibert was taken to the police station and systematically interrogated for 30 to 40 minutes without Miranda warnings about

40

her role in a terrible crime resulting in a young teenager's death." United States v. Douglas, 688 F. App'x 658, 664 (11th Cir. 2017) (per curiam) (unpublished) (citing Seibert, 542 U.S. at 604-05). "The police officer conducting the interrogation made a 'conscious decision' to withhold Miranda warnings and resorted to the interrogation technique he had been taught: question first, then give warnings, and then repeat the question to re-elicit an incriminating statement." Id. at 664-65 (quoting Seibert, 542 U.S. at 604-05). "After the suspect made a crucial admission, she was given a break, Miranda warnings were administered, and the suspect was immediately confronted with her pre-warning statements in order to extract the more elaborate conforming admissions." Id. at 665 (citing Seibert, 542 U.S. at 605).

"In order for *Seibert* to apply, 'the two-step interrogation technique [must be] used in a calculated way to undermine the *Miranda* warning.'" Street, 472 F.3d at 1314 (alteration in original) (quoting Seibert, 542 U.S. at 622). Santana "makes no argument that [Trooper Moremen] used a deliberate question first strategy to induce the statements." United States v. Jackson, CRIMINAL ACTION NO. 1:15-CR-00159-SCJ-JFK, 2016 WL 2742397, at *3 (N.D. Ga. May 10, 2016), aff'd, 713 F. App'x 963 (11th Cir. 2017) (per curiam) (unpublished) (citation and internal marks omitted). Trooper Moremen's explanation suggests that the failure to warn was based on his mistake, rather than part of "protocols, customs, or training that required officers to

41

use a deliberate two-step interrogation technique," Douglas, 688 F. App'x at 665, and there is no evidence to suggest he "set out to intentionally circumvent or undermine the protections the *Miranda* warnings provide," Street, 472 F.3d at 1314; see also United States v. Shine, 306 F. Supp. 3d 1322, 1333 (M.D. Ala. 2018) (second alteration in original) (citation omitted) (agreeing with the recommendation "that there [was] not sufficient evidence that the officers here used a 'two-step interrogation technique . . . in a calculated way to undermine the *Miranda* warning'"). Rather, Trooper Moremen admittedly "just messed up." Street, 472 F.3d at 1314.

Moreover, while Santana argues that "Trooper Morem[e]n proceeded to ask [her] questions of the same type and concerning the same subject matter that he had just asked her without the benefit of Miranda warnings" and that the "subject matter of the DEA interrogation was the same as that for Trooper Morem[e]n's questions," [Doc. 45 at 35-36], there is no indication that Trooper Moremen or the DEA agents confronted Santana with her prior unwarned statements in an effort to have them repeated, or otherwise relied on the prewarning admissions in any way while obtaining the postwarning statements, see Street, 472 F.3d at 1314 (agent's questioning was not an attempt to circumvent Miranda where he "did not withhold *Miranda* warnings, solicit a full confession, and then lead [defendant] back through his confession again"); cf. Seibert, 542 U.S. at 621 (Kennedy, J., concurring)

(deliberate two-step technique found where "postwarning interview resembled a cross-examination[,]" and where interviewing officer "pushed [defendant] to acknowledge [prewarning statements]").  Further, Santana does not allege that her pre-Miranda statements were actually involuntary under the Fifth Amendment, nor does the record contain even the slightest hint that those statements were obtained as a result of coercion.

The Court finds that, despite having been obtained in technical violation of Miranda, Santana's pre-Miranda statements were voluntarily made.  Accordingly, the admissibility of her post-Miranda statements is governed by Elstad, see Street, 472 F.3d at 1314 (holding that Elstad applied because the interviewing agent did not use interrogation techniques designed to undermine Miranda); United States v. Hernandez, 200 F. App'x 283, 287 (5th Cir. 2006) (per curiam) (unpublished) (holding that Elstad applied where there was "no evidence . . . that the [] officers were pursuing any kind of deliberate strategy that would require suppression . . . under Seibert), under which "the relevant inquiry is whether, in fact, the second statement was also voluntarily made," Elstad, 470 U.S. at 318; see also United States v. Guerrero-Acosta, 152 F.3d 930, 930 (9th Cir. 1998) (unpublished) (district court properly admitted defendant's post-Miranda statements after prior failure to warn

where there was "no evidence [that defendant] was coerced to make either statement").

In assessing whether a confession was voluntary, the Court must determine whether the defendant "'made an independent and informed choice of [her] own free will, possessing the capability to do so, [her] will not being overborne by the pressures and circumstances swirling around [her].'" Martin v. Wainwright, 770 F.2d 918, 924 (11th Cir. 1985) modified on other grounds on denial of reh'g, 781 F.2d 185 (11th Cir. 1986) (footnote omitted) (quoting Jurek v. Estelle, 623 F.2d 929, 937 (5th Cir. 1980) (en banc), cert. denied, 450 U.S. 1001, 1014 (1981)).  Here, there is no indication that Santana's post-Miranda statements were involuntary.  While Santana was in handcuffs during the brief custodial interrogation by Trooper Moremen, and testimony regarding whether she was in handcuffs during the subsequent DEA interview was inconclusive, there is no evidence that any physical force or threats were employed against her, (Tr. at 76, 112, 122, 125-26, 136, 144-46, 148-49; Gov. Ex. 2); see also United States v. Manson, Criminal Indictment No. 1:11-CR-13-AT-LTW-2, 2012 WL 2861595, at *2 (N.D. Ga. July 11, 2012) (footnote and citation omitted) ("[W]hile the Defendant's interrogation while he was handcuffed and under arrest might have carried some inherent intimidation, the overall circumstances of the interrogation were not sufficiently coercive as to vitiate the

voluntariness of Defendant's statements."), and Agents Huffman and Johnson testified that Santana did not express any discomfort during the interview, (Tr. at 122, 147). The troopers and the DEA agents did not make any promises to Santana to induce her to speak against her will. (Tr. at 76, 122, 125, 144, 146); see also (Gov. Ex. 2). Additionally, Santana's decision to continue speaking with Trooper Moremen after she verbally waived her Miranda rights and with Agents Huffman and Johnson after she signed a written waiver of her <u>Miranda</u> rights is "highly probative" of the voluntariness of her post-<u>Miranda</u> statements. See <u>Elstad</u>, 470 U.S. at 318. Given these circumstances, the Court concludes that Santana's post-<u>Miranda</u> statements were voluntary.

Finally, in order to establish the admissibility of Santana's post-<u>Miranda</u> statements, the government must show by a preponderance of the evidence that Santana validly waived her <u>Miranda</u> rights. <u>United States v. Chirinos</u>, 112 F.3d 1089, 1102 (11th Cir. 1997); see also <u>Colorado v. Connelly</u>, 479 U.S. 157, 168-69 (1986). In <u>Miranda</u>, the Supreme Court established certain procedures which law enforcement must follow to protect against the "compelling pressures" inherent in custodial interrogation. 384 U.S. at 467. Specifically, officers must fully advise the suspect of the government's intention to use her statements to secure a conviction, and must inform her of her rights to remain silent and to "have counsel present . . . if [she] so

45

desires." Id. at 468-70.  Miranda further requires that law enforcement respect the suspect's decision to exercise her rights as outlined in the warnings.  "If the individual indicates in any manner, at any time prior to or during questioning, that [s]he wishes to remain silent, the interrogation must cease." Id. at 473-74 (footnote omitted).  "If the individual states that [s]he wants an attorney, the interrogation must cease until an attorney is present." Id. at 474.

A defendant may waive her rights if the waiver is made knowingly, intelligently, and voluntarily. Id. at 444.  This inquiry has two distinct dimensions:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.  Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.  Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived.

United States v. Patterson, Criminal No. 1:06-CR-500-1-TWT, 2007 WL 2331080, at *3 (N.D. Ga. Aug. 10, 2007), adopted at *1  (citation omitted) (quoting United States v. Barbour, 70 F.3d 580, 585 (11th Cir. 1995)); see also Moran v. Burbine, 475 U.S. 412, 421 (1986); Edwards v. Arizona, 451 U.S. 477, 482 (1981); Fare v. Michael C., 442 U.S. 707, 725 (1979).  "No single factor is necessarily determinative of the issue whether a defendant knowingly and intelligently waived [her] rights but the court must

engage in a fact-specific inquiry based on all of the circumstances." Patterson, 2007 WL 2331080, at *3 (citation omitted). However, an express oral or written waiver of Miranda is strong proof of the validity of the waiver. United States v. Stephens, 202 F. Supp. 2d 1361, 1370 (N.D. Ga. 2002). To find a waiver involuntary, coercion by law enforcement is a "necessary predicate," Connelly, 479 U.S. at 167, and "in the absence of [such] coercion a court cannot conclude a defendant's waiver or inculpatory statements are involuntary," United States v. Minard, 208 F. App'x 657, 660 (10th Cir. 2006) (unpublished).

Trooper Moremen advised Santana of her Miranda rights, and she nodded her head in the affirmative when asked if she understood and wished to speak with him. See (Gov. Ex. 2 at 13:41:10-13:41:45; Tr. at 75). After being transported to a DEA facility and waiting in an interview room for approximately 15 minutes, (Tr. at 138-39, 151), she was read her Miranda rights, indicated she understood her rights, and waived them by signing a waiver form, (Tr. at 109-18, 122, 139-44, 152-53). She did not attempt thereafter to withdraw her waiver at any point during the interview, request an attorney, express discomfort, or indicate that she did not understand the process. (Tr. at 123, 143, 146-47). Also, as noted earlier, there is no indication in the record of any coercion used in connection with the waiver or interview.[19] The

---

[19] Santana argues that the "situation was rich in coercion and psychological pressure," and that it "is impossible to divorce the relinquishment of the rights to

remain silent and counsel from the pressure the DEA agents placed upon [her] at a time when she was indeed vulnerable." [Doc. 45 at 38]. To support her argument, Santana points out that she "was overcome with emotion" during the interview and "cried for the first five minutes of the questioning." [Id.]. She also points to the DEA agents' statement that "'[t]his is the only chance you'll get to actually come forward with information that will help you out,'" [id. (quoting (Tr. at 155))], which occurred in the discussion of Santana's cooperation to help herself, (Tr. at 154-55). However, Agent Huffman testified that it was not uncommon for someone in Santana's situation to cry during the interview and that while she cried for about the first five minutes, she did not remain emotional throughout the remainder of the interview. (Tr. at 121, 131). Contrary to Santana's assertion, the amount of emotion she expressed during the interview is not a basis for finding her voluntary statements inadmissible. See Burgess v. Thomas, No. 5:14-cv-00673-RDP-HGD, 2015 WL 4711203, at *7 (N.D. Ala. Apr. 23, 2015), adopted by 2015 WL 4716283, at *1 (N.D. Ala. Aug. 7, 2015) (citations omitted) ("A certain amount of stress, nervousness, and emotion is to be expected in an individual who has been arrested for murder; it certainly is not a basis for finding inadmissible an otherwise voluntary statement."); see also United States v. Carter, No. 13 CR 878-1, 2014 WL 5023470, at *4 (N.D. Ill. Oct. 7, 2014) (citations omitted) ("Supreme Court case law indicates that a 'defendant's mental condition, by itself and apart from its relation to official coercion' is not dispositive 'of the inquiry into constitutional voluntariness.' In the absence of coercion, mental and emotional instability do not render a coherent and alert defendant's custodial *Miranda* waiver and voluntary statements to law enforcement officers inadmissible."); United States v. Stevenson, Criminal Case No. 1:ll-CR-350-ODE-RGV, 2012 WL 1418635, at *4 (N.D. Ga. Apr. 23, 2012) ("Similarly, there is no evidence that Defendant's emotional state, as evidenced by his crying, impaired his awareness of his rights at stake."). As for the statement regarding Santana's cooperation, Agent Johnson testified that his statement that "this is the only chance you'll get to actually come forward with information that will help you out" was not "verbatim" and he explained that he did not "convey[] to [Santana] that essentially if she [did not] answer questions now, she [would] have missed the boat," but that it was "the gist of it," as he "explain[ed] the way the federal system works and how the court system works, and [that] this [was her] opportunity to provide information to help [herself] out." (Tr. at 155-56). These statements by the DEA agents do not render Santana's statements involuntary. See United States v. Bailey, 979 F. Supp. 1315, 1318-19 (D. Kan. 1997) (last two alterations in original) (citations and internal marks omitted) ("Informing [defendant] that his only chance

government has shown that, under the totality of the circumstances, Santana was aware of the nature of her rights being abandoned and the consequences of her decision to abandon them and that she knowingly, intelligently, and voluntarily waived her <u>Miranda</u> rights.  Accordingly, it is **RECOMMENDED** that Santana's motion to suppress her post-<u>Miranda</u> statements, [Doc. 21], be **DENIED**.

## D.     <u>Consent to Search Santana's Cell Phone</u>

Santana contends that her consent to search her cell phone was not voluntarily rendered and any evidence obtained through examination of her phone should be suppressed.  [Doc. 45 at 39-41].  The government argues that the grant of consent to search her cell phone was knowing and uncoerced.  [Doc. 48 at 21-25].

"It is well settled under the Fourth and Fourteenth Amendments that a search conducted without a warrant issued upon probable cause is 'per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions.'" <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 219 (1973) (quoting <u>Coolidge v. New Hampshire</u>, 403 U.S. 443, 454-455 (1971); <u>Katz v. United States</u>, 389 U.S. 347, 357 (1967)).  "One of the well-established exceptions to the probable cause and warrant

---

to cooperate with the police would be to make truthful statements did not render his confession involuntary" and "[a] promise to bring any cooperation on the part of the defendant to the [court's] . . . attention does not constitute a coercive promise sufficient to render any subsequent statements involuntary and inadmissible.").

requirements is a search which is conducted pursuant to voluntary consent." <u>United States v. Garcia</u>, 890 F.2d 355, 360 (11th Cir. 1989).

"In order for consent to a search to be deemed voluntary, it must be the product of an essentially free and unconstrained choice." <u>Garcia</u>, 890 F.2d at 360. "[T]he principles for determining the voluntariness of consent for a search are the same as those for determining the voluntariness of a confession– i.e. whether consent is voluntary turns on questions of fact, determinable from the totality of the circumstances." <u>United States v. Boskic</u>, Criminal No. 04-10298-DPW, 2006 WL 1540488, at *19 (D. Mass. June 2, 2006) (citation and internal marks omitted); <u>see also</u> <u>United States v. Tovar-Rico</u>, 61 F.3d 1529, 1535 (11th Cir. 1995) (noting voluntariness of consent is judged in light of the totality of the circumstances).  Relevant factors include the presence of coercive police procedures, the extent of the person's cooperation with the officer, the person's awareness of her right to refuse consent, the person's education and intelligence, and the person's belief that no incriminating evidence will be found.  <u>Purcell</u>, 236 F.3d at 1281; <u>see also</u> <u>United States v. Chaidez-Reyes</u>, Criminal Action No. 1:13-CR-158-ODE-AJB, 2014 WL 547178, at *15 (N.D. Ga. Feb. 10, 2014), adopted at *1.  Ultimately, the burden is on the government to prove that the consent was given voluntarily.  <u>United States v. Bentley</u>, 151 F. App'x 824, 827 (11th Cir. 2005) (per curiam) (unpublished) (quoting <u>United States v. Chemaly</u>,

741 F.2d 1346, 1352 (11th Cir. 1984)); Tovar-Rico, 61 F.3d at 1536 (quoting Florida v. Royer, 460 U.S. 491, 497 (1983)); United States v. Blake, 888 F.2d 795, 798 (11th Cir. 1989).

At the beginning of the DEA interview, Santana was presented with a Consent to Search form, which Agent Huffman explained to her and allowed her to read,[20] and then Santana voluntarily consented in writing to the search of her cell phone, by completing and signing the form in the presence of Agents Huffman and Johnson.  (Tr. at 109-18, 122, 139-44, 152-53; Gov. Ex. 4).  In granting consent, she signed below the following statement: "I understand that I have the right to refuse the consent to search described above and to refuse to sign this form.  I further state that no promises, threats, force, physical or mental coercion of any kind have been used against me to get me to consent to the search of the mobile telephone(s)." (Gov. Ex. 4); see also (Tr. at 112).  Santana did not later revoke the consent to search her phone, (Tr. at 123), and Agents Huffman and Johnson testified that they did not threaten her, make promises, or engage in physical contact with Santana to coerce her consent, (Tr. at 113, 122, 125-26, 143-44, 146, 148-49); see also United States v. Zapata, 180 F.3d 1237, 1242 (11th Cir. 1999) (alterations in original) (citation omitted) ("'[T]he absence of intimidation, threats, abuse (physical or psychological), or other

_____

[20] Agent Huffman testified that Santana understood English and she expressed no difficulty in reading the form.  (Tr. at 112, 140).

coercion is a circumstance weighing in favor of upholding what appears to be a voluntary consent.'").

"Considering the totality of these facts and circumstances, and comparing this encounter to more coercive circumstances that have nonetheless been found to be consensual, the Court finds that [Santana] freely and voluntarily consented to a search of the [cell phone]." Rodriguez-Alejandro, 664 F. Supp. 2d at 1338 (citations omitted); see also United States v. Brown, 223 F. App'x 875, 880 (11th Cir. 2007) (per curiam) (unpublished) (finding consent to search voluntary despite the fact that officer had drawn his weapon and placed defendant in handcuffs); United States v. Hidalgo, 7 F.3d 1566, 1567, 1571 (11th Cir. 1993) (finding consent voluntary where defendant was arrested by law enforcement who had broken into his home early in the morning, woke him up, and forced him to the ground at gun point); Garcia, 890 F.2d at 361 (holding consent voluntary where defendant was arrested by numerous officers, was patted down for weapons, was handcuffed, and where the officers refused to accept defendant's conditional consent to search and threatened to obtain a search warrant if he did not consent to a full search).  Accordingly, the Court finds that Santana voluntarily consented to the search of her cell phone during the DEA interview on October 27, 2017, and it is **RECOMMENDED** that Santana's motion

to suppress evidence arising from the search of her cell phone, [Docs. 20], be **DENIED**.

### III.  CONCLUSION

For the foregoing reasons and cited authority, it is hereby **RECOMMENDED** that Santana's motions to suppress evidence and her statements, [Docs. 20 & 21], be **DENIED**.

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, certified Ready for Trial.

**IT IS SO ORDERED** and **RECOMMENDED**, this 19th day of September, 2018.

_Russell G. Vineyard_
RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE